J-S12003-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| TRAMAYNE BLACKWELL, | |
| Appellant | No. 2285 EDA 2012 |

Appeal from the PCRA Order July 13, 2012
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0802721-1999

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| TRAMAYNE BLACKWELL, | |
| Appellee | No. 2398 EDA 2012 |

Appeal from the PCRA Order July 13, 2012
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0802721-1999

BEFORE: BOWES, SHOGAN and FITZGERALD,* JJ.

MEMORANDUM BY BOWES, J.: **FILED JULY 27, 2015**

The Commonwealth appeals from the July 13, 2012 court order

granting Tramayne Blacknall[1] a new trial, pursuant to the Post-Conviction

---

[1] The defendant's actual name is Tramayne Blacknall. However, the case was originally improperly captioned as ***Commonwealth v. Tramayne***

\* Former Justice specially assigned to the Superior Court.

Relief Act ("PCRA"), on the basis of after-discovered evidence. Mr. Blacknall also filed an appeal from the same order challenging the PCRA court's denial of his remaining trial counsel ineffectiveness claims. These appeals have been consolidated. After careful review, we affirm.

A jury found Mr. Blacknall guilty of first-degree murder and possession of an instrument of crime on August 2, 2001, and acquitted him of a second count of first-degree murder.[2] The facts underlying these convictions stemmed from a December 10, 1998 shooting that resulted in the deaths of Rashawn Calhoun and Eric Baskerville. The jury acquitted Mr. Blacknall of the shooting death of Mr. Baskerville. Though not revealed at trial, Mr. Baskerville allegedly had fired shots in Mr. Blacknall's direction in September of 1998, but struck Herb Bryant in the ankle.

The trial testimony revealed that, at approximately 6:30 p.m. on the corner of Greenway Avenue and South 60th Street, Philadelphia, Mr. Calhoun and Mr. Baskerville were shot. Police arrived shortly after and found Mr. Baskerville unresponsive. Doctors later pronounced him dead at 7:00 p.m. Mr. Calhoun, who had been shot in the chest and back, was located further up the street and conscious. He indicated to a responding officer that a

---

***Blackwell*** and remained so throughout the duration of Mr. Blacknall's case, including in a prior published decision. We will call the petitioner by his proper name.

[2] This case began as a death penalty matter, but after Mr. Blacknall's acquittal for the murder of Mr. Baskerville the Commonwealth no longer sought the death penalty.

person known as T.J. had shot him. It was established that Mr. Blacknall was known as T.J.[3] Thereafter, medical personnel arrived to treat Mr. Calhoun. A paramedic testified at trial that Mr. Calhoun informed him four or five times that T.J. shot him.

During his twenty-day hospitalization, Mr. Calhoun underwent two surgeries and was scheduled for a third. Prior to the third operation, he told his mother that T.J. shot him. He informed his mother that T.J. was the father of a child with a woman known as Lotta. Blacknall had a child with a woman named Faith Feaster, who was called Lotta. Mr. Calhoun died before his third operation could be completed. The trial court admitted each of the victim's statements into evidence as dying declarations.

Mr. Calhoun also relayed to his mother that he and Mr. Baskerville had walked past T.J. and two other individuals whom he identified as Clinton and Herbie. Mr. Baskerville and Mr. Calhoun were travelling to a girl's home. Mr. Baskerville apparently entered the young woman's house; after exiting, he and Mr. Calhoun returned to walking back down the street. At this point, the three other men yelled, "Get them M.F.'s," N.T., 8/1/01, and opened fire. Mr. Baskerville was shot and fell to the ground. Mr. Calhoun continued to flee, and, when he turned around, observed Mr. Blacknall firing a weapon.

At the scene, police discovered twenty-two pieces of ballistic evidence, twenty of which were fired cartridge cases. Among this evidence were

---

[3] Mr. Blacknall's middle name is Javon. Thus, his first two initials are T.J.

cartridges from either a .380 caliber or nine millimeter firearm, nine millimeter cartridges and .45 caliber spent shell casings. Mr. Baskerville was shot with a .45 caliber weapon. It could not be determined what type of weapon was used on Mr. Calhoun. Police apprehended Mr. Blacknall in New Jersey on May 31, 1999. When police took him into custody, he gave a false name of Alfonso C. Strong.

At trial, Mr. Blacknall presented the testimony of Deborah Hale, Charles Gore, and Martel Hunter. In addition, Mr. Blacknall testified in his own defense. Ms. Hale testified that she witnessed the shootings of Mr. Baskerville and Mr. Calhoun. According to Ms. Hale, Mr. Baskerville and Mr. Calhoun walked up the street and entered a house. Another individual, Clinton Driver, told her to get off the street. Clinton Driver is the cousin of Herb Bryant, the person allegedly shot by Mr. Baskerville. After the two victims left the house, Clinton Driver opened fire and Ms. Hale ran. She maintained that Mr. Blacknall was not present when the shooting began and that she had seen him leave the area with her cousin, Mr. Gore.

Mr. Gore testified that he was friends with Mr. Baskerville and Mr. Blacknall, and acquainted with Mr. Calhoun. He submitted that around 5:30 or 6:00 p.m., Mr. Blacknall asked him for a ride to pick up Mr. Blacknall's daughter on 53rd Street and Divinity or Divine Street. Mr. Gore then traveled in his car with Mr. Blacknall to that area, and watched him enter a house. This took approximately five minutes. Mr. Gore then returned to the

60th Street area without Mr. Blacknall, and claimed that he observed ambulance and police and the two victims on the ground.

Mr. Hunter was serving in the Marine Corps overseas at the time of the shooting. However, he was Mr. Blacknall's cousin and had known Clinton Driver for close to a decade. Mr. Hunter provided that he visited the Philadelphia area in February of 1999 to visit his fiancee's grandmother. During this visit, he encountered Clinton Driver. According to Mr. Hunter, Clinton Driver told him, "I chalked these two niggers up on the corner[.]" N.T., 8/1/01, at 229.

Mr. Blacknall took the stand in his own defense. He maintained that he was living with his girlfriend, Faith "Lotta" Feaster on Greenway Avenue, Philadelphia. Ms. Feaster would take their child to a babysitter on 51st or 52nd Street and Divinity and leave the car at the babysitter's home. According to Mr. Blacknall, he returned home from work via public transportation. He lingered on the corner for a short period with Ms. Hale, Mr. Gore, Tarik "Terry" Driver, Clinton Driver, a person identified as Legrin Joe, Andre Yellock, and an individual he named only as Herb. He then went inside his residence to change clothes. After changing clothes, he asserted that he asked Mr. Gore for a ride to the babysitter's, whom he knew as Gina.

Mr. Gore gave him a ride to the babysitter's, and when Mr. Blacknall arrived, the babysitter asked him if he could drop off her and her children at 56th Street and Allison Street. Mr. Blacknall posited that he agreed and he

took her to that area before returning to his residence on 60th Street and Greenway. When he returned, police and ambulance were in the area.

The jury did not accept Appellant's version of events, and found him guilty of shooting Mr. Calhoun.[4] Following the jury verdict, on August 16, 2001, the court sentenced Mr. Blacknall to the mandatory term of life imprisonment without parole for the murder charge and a concurrent sentence of two and one-half to five years incarceration for the PIC count. Mr. Blacknall timely filed post-sentence motions on August 24, 2001. Newly-appointed counsel then filed a premature notice of appeal on November 1, 2001, prior to the trial court's resolution of Mr. Blacknall's post-sentence motion. The trial court subsequently denied Mr. Blacknall's post-sentence motion by operation of law on December 24, 2001. Despite this order rendering the premature appeal proper, **see** Pa.R.A.P. 905(5), yet another attorney withdrew Mr. Blacknall's appeal, which was discontinued on January 30, 2002.

The following day, counsel filed a PCRA petition seeking the reinstatement of his direct appeal rights *nunc pro tunc*. The PCRA court granted that petition. This Court subsequently affirmed Mr. Blacknall's judgment of sentence on September 10, 2003. **Commonwealth v.**

---

[4] The record reflects that upon being found guilty, Mr. Blacknall began to sob and delivered a lengthy speech proclaiming his innocence. As discussed *infra*, the Commonwealth contends that the PCRA court erroneously considered this factor in awarding a new trial.

***Blackwell***, 835 A.2d 827 (Pa.Super. 2003) (unpublished memorandum). Mr. Blacknall did not seek review with the Pennsylvania Supreme Court.

Thereafter, Mr. Blacknall filed a counseled PCRA petition on February 24, 2004.[5] In his petition, Mr. Blacknall raised three ineffective assistance of counsel claims relative to the failure to call three witnesses: Ervin Kirkman, Officer Timothy Wade, and Officer Mark Moore. These same claims had been raised on direct appeal, but were dismissed without prejudice based on ***Commonwealth v. Grant***, 813 A.2d 726 (Pa. 2002). In addition, Mr. Blacknall filed a *pro se* witness certification regarding Regina McKnight, his daughter's babysitter. At an October 1, 2004 proceeding, counsel proffered that he attempted to locate Ms. McKnight, who would present alibi testimony. He asked for a continuance to find Ms. McKnight, which the court granted. Ms. McKnight appeared for court on October 29, 2004, but did not testify because PCRA counsel had yet to interview her.

At a subsequent proceeding, on November 5, 2004, PCRA counsel represented that Ms. McKnight informed his investigator that Mr. Blacknall had been with her from approximately 6:15 to 6:30 p.m. to pick up his daughter and drop off Ms. McKnight at another home. However, he rather strangely concluded that, since Mr. Blacknall was still within four blocks of

---

[5] Mr. Blacknall retained direct appeal counsel Jack McMahon, Esq. Mr. McMahon continued to represent Mr. Blacknall for his "first" PCRA petition, filed after the reinstatement of his direct appeal rights. There is no dispute that the McMahon filing was timely filed.

the shooting, trial counsel was not ineffective in declining to present her testimony. Indeed, although PCRA counsel filed an amended petition, he did not argue in favor of his client's positions during the status hearings; instead, he set forth reasons why the claims would not succeed. At a later PCRA status hearing, he would add that, since Ms. McKnight would also confirm that Mr. Blacknall was known as T.J. and the father of Faith "Lotta" Feaster's baby, Ms. McKnight's testimony would not have exculpated Mr. Blacknall. N.T., 4/21/08, at 64.

Without conducting an evidentiary hearing,[6] on November 16, 2004, the PCRA court issued a Pa.R.Crim.P. 907 notice of intent to dismiss. Although ostensibly represented by PCRA counsel, Mr. Blacknall filed a *pro se* response on December 10, 2004, alleging, in part, that PCRA counsel was ineffective. On December 17, 2004, the PCRA court erroneously informed Mr. Blacknall that his counsel had withdrawn via **Turner/Finley**[7] practice

---

[6] Although the PCRA court held several status hearings, which is standard PCRA practice in Philadelphia, none of those proceedings were evidentiary hearings. This Court's previous published decision appears to have incorrectly presumed that these hearings were evidentiary proceedings and that PCRA counsel failed to appear. **See Commonwealth v. Blackwell**, 936 A.2d 497, 499 (Pa.Super. 2007). This is likely explained by the fact that Mr. Blacknall, in his Rule 1925(b) statement in that appeal, maintained that the proceedings were evidentiary hearings and the PCRA court itself, in its Rule 907 notice, set forth that it conducted three evidentiary hearings. **See** Rule 907 Notice, 4/14/05, at 2.

[7] **Commonwealth v. Turner**, 544 A.2d 927 (Pa. 1988); **Commonwealth v. Finley**, 550 A.2d 213 (Pa.Super. 1988) (*en banc*).

and dismissed Mr. Blacknall's petition.[8]  Within thirty days of that order, on

January 7, 2005,[9] Blacknall filed an additional *pro se* PCRA petition.  Therein,

although he could still timely appeal, he sought reinstatement of his PCRA

appeal rights, and alleged new ineffective assistance of trial counsel claims

and raised claims that PCRA counsel was ineffective.

The PCRA court treated the petition as a serial petition and issued a

Rule 907 notice of intent to dismiss on April 14, 2005.  Mr. Blacknall filed a

*pro se* response on May 4, 2005.[10]  In his response, Mr. Blacknall sought to

withdraw the January 2005 petition, but he continued to request the

reinstatement of his PCRA appeal rights, which had now expired, from the

denial of his February 2004 petition.  The PCRA court issued a final order

dismissing the January 2005 petition dated July 6, 2005.  Mr. Blacknall

timely appealed from that order.

This Court, in a published decision, ruled that the May 4, 2005

response to Mr. Blacknall's notice of dismissal was both a petition to

withdraw his January petition and a new PCRA petition alleging

governmental interference.  ***Commonwealth v. Blackwell***, 936 A.2d 497

---

[8] The PCRA court indicated that it did not send this filing, which was a boilerplate pre-printed form sent by the Philadelphia PCRA unit. ***See*** N.T., 4/21/08, at 74; ***see also*** N.T., 6/16/08, 41.

[9] The document was docketed on January 10, 2005.

[10] This filing is time stamped May 9, 2005, but an accompanying memorandum indicates it was received by the PCRA judge on May 4, 2005.

(Pa.Super. 2007). The panel then acknowledged that this new petition was untimely on its face, but held that it met the governmental interference timeliness exception. Further, the **Blackwell** Court found that the newly-discovered fact exception applied to Mr. Blacknall's May 2005 filing.

Ultimately, the panel remanded to the PCRA court to conduct an evidentiary hearing on Mr. Blacknall's claims of PCRA counsel ineffectiveness and to determine whether PCRA counsel had abandoned Mr. Blacknall. We further held that, if the PCRA court determined that original PCRA counsel abandoned Mr. Blacknall, Mr. Blacknall was to be permitted review of his ineffective assistance of trial counsel claims.

The PCRA court conducted evidentiary hearings on April 21, 2008 and June 16, 2008, on the question of PCRA counsel's representation. Mr. Blacknall continued to steadfastly assert his innocence. The court determined that it erred in allowing PCRA counsel to argue at the status hearings, without the presence of Mr. Blacknall, that Mr. Blacknall's claims lacked merit rather than direct counsel to file a no-merit letter. Thus, the PCRA court permitted Mr. Blacknall to litigate his initial PCRA petition filed in 2004. Mr. Blacknall, with the aid of current counsel, filed an amended petition on February 5, 2009. The PCRA court conducted evidentiary hearings on April 26, 29, and 30, 2010.

Mr. Blacknall filed a supplemental amended petition on August 3, 2011, asserting after-discovered evidence, and requested a hearing on these

claims. Although the Commonwealth opposed the evidentiary hearing, the court held hearings on February 13, 2012, March 1, 2012, March 6, 2012, and March 15, 2012.

Trial counsel testified that, due to the age of the case and because he had withdrawn from the matter after trial, he no longer had a file for the case. However, he did recover from his computer various letters and correspondence related to the case. Several letters were addressed to the Commonwealth regarding Clinton Driver. Specifically, counsel asked for police reports from a murder case in which Clinton Driver was alleged to have killed Lorenzo Shedrick, a purported witness in Mr. Blacknall's matter. Clinton Driver was ultimately convicted of that crime.

In addition, trial counsel informed the district attorney's office that Mr. Blacknall reported threats made by Clinton Driver's family to Mr. Blacknall's then-girlfriend and child. Trial counsel also sought a police report for a criminal case against Steven Driver, who shot Charles Gore, a key witness in Mr. Blacknall's case, before Appellant's trial. Steven Driver is Clinton's brother. Both Clinton and Steven Driver had provided police statements implicating Mr. Blacknall in the shooting, but neither testified at trial.

Trial counsel further related that he hired a private investigator, Karim El-Shabazz, to assist him. Mr. El-Shabazz had no direct recollection of his investigation in this case and did not remember either Mr. Blacknall or his mother. However, he did posit that finding a single woman with four

children would have been relatively easy. Ms. McKnight was single at the time with four biological children.

With respect to the names of witnesses, trial counsel had no memory of specific names provided to him by Mr. Blacknall, but his records showed that he was aware of Mr. Hunter, Mr. Gore, Ms. Hale, Ms. Feaster, and Mr. Blacknall's mother. According to trial counsel, had he been provided a name of an alibi witness, he would have instructed Mr. El-Shabazz to locate and interview that person. Counsel, nevertheless, could not recollect the names of all of the witnesses he asked Mr. El-Shabazz to seek out. However, in regards to Ms. McKnight, he stated that if he knew she was an alibi witness, he would have had Mr. El-Shabazz follow up.

When asked whether he knew that Mr. Blacknall would testify to having an alibi, counsel stated that he could not recall. He also provided that his recollection of events was not refreshed by the trial transcript of Mr. Blacknall's testimony regarding Ms. McKnight. Further, he could not remember whether he was shocked or surprised by Mr. Blacknall's testimony. Trial counsel did acknowledge that if he had interviewed his client and was aware of what his client's testimony was going to be, he would have attempted to corroborate that evidence. Nonetheless, trial counsel could not recall ever interviewing Mr. Blacknall and denied having knowledge of multiple letters sent by Mr. Blacknall referencing Ms. McKnight. Indeed, trial counsel had virtually no recollection of the case and could not

remember any conversations with Mr. Blacknall either at the beginning or throughout the trial.

Ms. McKnight testified after trial counsel.[11] She related that on December 10, 1998, she lived at 1317 Divinity Street in Philadelphia. According to her, she may have moved from that address by July 30, 2001,[12] and lived at 1234 South Markoe Street in Philadelphia. She acknowledged that she moved every two years. Ms. McKnight recounted that she babysat Mr. Blacknall's daughter, Na-Jai, beginning when the girl was four or five months old. She asserted that she babysat Monday through Friday from approximately 7:30 a.m. to 6:00 p.m. Ms. McKnight stated that Lotta Feaster would bring her daughter over and Ms. McKnight would then take Ms. Feaster's vehicle and drop off Ms. Feaster at her work place, the Hilton Hotel. Afterward, Ms. McKnight would return home with Ms. Feaster's vehicle and daughter and Mr. Blacknall would retrieve the girl between 6:00 p.m. and 6:15 p.m.

Additionally, Ms. McKnight provided that she was not friends with Mr. Blacknall and did not know him well, but knew Ms. Feaster. She stated that on December 10, 1998, Mr. Blacknall arrived at approximately 6:15 p.m. Ms. McKnight asked him for a ride to her aunt's house. He then waited for

---

[11] Ms. McKnight had provided two witness certifications much earlier that are largely consistent with her testimony. The record contains an August 12, 2004 certification and a March 7, 2005 certification from Ms. McKnight.

[12] Mr. Blacknall's trial began on July 31, 2001.

her and her five children[13] to finish eating dinner. Afterward, Ms. McKnight dressed Mr. Blacknall's daughter and her own children, including putting a snowsuit on Mr. Blacknall's daughter. Mr. Blacknall then drove Ms. McKnight and her children to her aunt's, which she maintained was six blocks down from her house and three or four blocks over from her residence. Ms. McKnight added that they left her home at approximately 6:40 p.m. and arrived at her aunt's shortly before 7:00 p.m.

In addition, Ms. McKnight testified that she learned that Mr. Blacknall had been charged with a crime several months later and eventually contacted either an investigator or an attorney. However, the attorney she referenced was Mr. Blacknall's original PCRA attorney, Jack McMahon. According to her, Mr. McMahon never returned her telephone calls and she did not personally speak with him, though she did talk with his investigator.

Ms. Feaster confirmed that Ms. McKnight babysat her daughter. Ms. Feaster related that she took her daughter to Ms. McKnight's between 7:00 a.m. and 7:30 a.m. for one week and then between 1:00 p.m. and 1:30 p.m., afterward. Ms. McKnight would then take Ms. Feaster to work. According to Ms. Feaster, this arrangement began in September of 1998 and ended in January of 1999, when Ms. Feaster ceased working and Ms. McKnight began nursing school. Ms. Feaster submitted that she worked

---

[13] One child, the youngest, was not her biological daughter.

from 3:00 p.m. until 11:00 p.m, except for a one-week training period in September when she worked from 7:30 a.m. until 3:30 p.m.

Additionally, Ms. Feaster testified that she only met with Mr. Blacknall's trial attorney one time, but that she had provided him with information regarding witnesses several times. The information she gave to trial counsel included reference to Ms. McKnight, which she maintained she provided to him both in person and over the telephone. Ms. Feaster set forth that she told trial counsel that Ms. McKnight also went by Regina McDonald, and that she did so before Mr. Blacknall's trial. When questioned by PCRA counsel, she stated that, during the trial proceedings, trial counsel told her that he was unable to find Ms. McKnight. However, in response to a follow up query by the PCRA court, Ms. Feaster provided that she reached out to a mutual friend to contact Ms. McKnight. That friend told Ms. Feaster that she was unable to reach Ms. McKnight and was consistently getting Ms. McKnight's voicemail.

Mr. Blacknall's mother, Sheila Casper, also testified during Mr. Blacknall's PCRA proceedings. She set forth that she learned from both Mr. Blacknall and Lorenzo Shedrick that Mr. Blacknall was not at the scene of the shooting. Mr. Shedrick also apparently informed her that Mr. Calhoun told the paramedic that it was T.J.'s friend, and not T.J., that had fired at Mr. Calhoun. Ms. Casper further maintained that she also gave trial counsel Ms.

McKnight's name and address and provided that same information to his investigator. However, she was told that Ms. McKnight could not be found.

Mr. Blacknall testified that he gave trial counsel the names of Lorenzo Shedrick, Deborah Hale, Calvin Jordan also known as Calvin Spellman, Charles Gore, Martel Hunter, Stanley Rothmiller, and Regina McKnight/McDonald. Mr. Shedrick was deceased at the time of trial, having been killed by Clinton Driver, and Mr. Jordan refused to testify. Mr. Blacknall provided copies of letters dated February 10, 2000, March 29, 2000 and June 6, 2000, purportedly sent to his attorney, mentioning Ms. McKnight, which complained of counsel's stewardship. Mr. Blacknall repeatedly denied being involved in the shooting, at one point crying on the stand during the hearings. He maintained as he has done throughout the proceedings that Clinton Driver shot and killed both Mr. Baskerville and Mr. Calhoun.

At a subsequent PCRA hearing, Mr. Blacknall presented the testimony of Toby Wellington. Mr. Wellington was incarcerated and was a cellmate with Mr. Blacknall for two or three months in 2005 at State Correctional Institute ("SCI") Frackville. In addition, he was later incarcerated with Clinton Driver and was Mr. Driver's cellmate for approximately three months at SCI-Rockville. Mr. Blacknall had told Mr. Wellington his story prior to Mr. Wellington being transferred to SCI-Rockville. Mr. Wellington related that

Clinton Driver admitted killing Mr. Baskerville and Mr. Calhoun.[14]   Mr. Wellington had previously given a similar statement to a private investigator, but had declined to sign any affidavits and refused to come forward to testify absent being protected.

Clinton Driver denied making any statements implicating himself in the murders to Mr. Wellington.  He testified that he did not shoot Mr. Baskerville and Mr. Calhoun and denied being on the street at the time of the incident. However, he also denied shooting Lorenzo Shedrick, the reason he was incarcerated, despite his defense being self-defense.   Clinton Driver maintained that police did speak with him shortly after the shootings in this case and told him that if he did not sign a paper stating that Mr. Blacknall committed the crime that they would charge his brother, Tarik "Terry" Driver.  The Commonwealth called a Detective John Rossiter to rebut Clinton Driver's testimony that police coerced him into giving a statement against Mr. Blacknall.  Clinton added that Mr. Blacknall was not at the scene at the time of the shootings.  Tarik Driver also stated that Mr. Blacknall was not the shooter, but that Mr. Blacknall's trial counsel never approached him or sent anyone to speak to him.

Steven Driver, who, like his brother Clinton, provided police with a statement implicating Mr. Blacknall, averred that he did so because police

---

[14] We note that the Commonwealth was permitted a standing hearsay objection to Mr. Wellington's testimony.

threatened to charge him and his brother Clinton for the crimes. He testified that Mr. Blacknall was not involved in the shooting and was not present at the time. Although Steven Driver was the Commonwealth's own witness, it rebutted his testimony that he was coerced by police with the testimony of one officer who took a statement from Steven Driver. That officer, Detective Gregory Rodden, denied that he had threatened Steven Driver. The officer actually accused by Steven Driver of forcing him to give a statement testified that he was not involved in the investigation into Mr. Blacknall's case.

The PCRA court granted Mr. Blacknall a new trial on two after-discovered evidence claims; specifically, alibi testimony from Regina McKnight and testimony from Toby Wellington that Clinton Driver confessed to committing the crime. The PCRA court denied Mr. Blacknall's remaining issues.

Both the Commonwealth and Mr. Blacknall timely appealed. The Commonwealth filed a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal prior to any court order directing it to do so. Mr. Blacknall also filed a concise statement raising six issues, after the court directed him to comply with Rule 1925(b). The PCRA court authored an opinion addressing both parties' contentions. This Court consolidated the

appeals. The matter is now ready for this Court's review.[15] Finding our resolution of part of the Commonwealth's second issue dispositive, we consider the Commonwealth's claims first and decline to reach Mr. Blacknall's cross-appeal issues.[16] The Commonwealth raises the following issues on appeal.

I. Did the lower court have jurisdiction over defendant's untimely third PCRA petition?

II. Did the lower court err in granting defendant a new murder trial based on purported after-discovered evidence?

Commonwealth's brief at 4.

At the outset, the Commonwealth attacks this Court's previous published decision ruling that Mr. Blacknall's May 4, 2005 filing constituted a timely PCRA petition. We reject the Commonwealth's position for myriad reasons. First, under the law of the case, this Court already determined that the May 4, 2005 filing was a timely petition. The Commonwealth did not appeal this decision to the Pennsylvania Supreme Court. Under the law of the case doctrine, "a court involved in the later phases of a litigated matter should not reopen questions decided by another judge of that same court or

---

[15] Although these appeals were filed in 2012, they were not submitted to this panel until February 2, 2015.

[16] Insofar as Appellant does level an ineffectiveness claim relative to counsel not challenging the sufficiency of the evidence, and a successful sufficiency issue entitles a party to discharge, we note that sufficient evidence did exist; therefore, counsel could not be ineffective.

- 19 -

by a higher court in the earlier phases of the matter." ***Commonwealth v. Starr***, 664 A.2d 1326, 1331 (Pa. 1995). Concomitantly, "(1) upon remand for further proceedings, a trial court may not alter the resolution of a legal question previously decided by the appellate court in the matter; (2) upon a second appeal, an appellate court may not alter the resolution of a legal question previously decided by the same appellate court[.]" ***Id***. These rules, our Supreme Court has opined,

> serve not only to promote the goal of judicial economy (as does the coordinate jurisdiction rule) but also operate (1) to protect the settled expectations of the parties; (2) to insure uniformity of decisions; (3) to maintain consistency during the course of a single case; (4) to effectuate the proper and streamlined administration of justice; and (5) to bring litigation to an end.

***Id***. Thus, the PCRA court could not revisit this Court's prior determination after remand and this Court is prohibited from altering our decision as to the timeliness of Mr. Blacknall's May 4, 2005 filing.

Furthermore, since Mr. Blacknall was effectively without meaningful representation, we decline to view his technical failure to assert the governmental interference exception in his May 2005 *pro se* document as requiring this Court to disregard the law of the case.[17] With respect to the

---

[17] The prior panel decision considered Mr. Blacknall's earlier January petition invoking the substantive governmental interference provision, contradistinguished from the timeliness exception, as adequately raising a governmental interference timeliness claim. ***See Commonwealth v. Blackwell***, 936 A.2d 497, 500 (Pa.Super. 2007) (mistakenly stating Mr. Blacknall checked box for timeliness exception). While such an averment in

- 20 -

subsequent amended petitions, they relate to Mr. Blacknall's original timely petition based on the PCRA court's findings, after our remand, and Supreme Court case law.[18]  Specifically, we remanded to the PCRA court to determine whether PCRA counsel was ineffective in his representation of Mr. Blacknall. The panel directed that, if the PCRA court concluded that PCRA counsel's representation deprived Mr. Blacknall of meaningful review, it should consider his underlying trial counsel ineffectiveness claims.

The PCRA court determined that it erred in permitting initial PCRA counsel to argue against his client without submitting a **Turner/Finley** no-merit letter.  This finding is beyond reproach and the record makes clear that Attorney McMahon consistently advocated against his client at status

---

that pleading would not adequately constitute pleading a timeliness exception in a subsequent filing, we note that the panel considered Mr. Blacknall's *pro se* May 2005 document to be a new petition.  Therefore, where a petition is defective as filed, a PCRA court is directed to permit the petitioner an opportunity to correct the defect.  Pa.R.Crim.P. 905(B).  Since the PCRA court did not offer Mr. Blacknall the opportunity to clarify any timeliness exception and he was effectively without counsel at the time, we decline to reject the law of the case doctrine in this matter.  **Cf. Commonwealth v. Perez**, 799 A.2d 848 (Pa.Super. 2002) (remanding for additional proceedings where PCRA counsel failed to address timeliness of PCRA petition); **Commonwealth v. Wiley**, 966 A.2d 1153 (Pa.Super. 2009).

[18] We note that the PCRA court expressly indicated below that the Commonwealth was not challenging its decision to reinstate Mr. Blacknall's right to pursue his collateral claims for relief.  **See** PCRA Court Opinion, 6/28/13, at 4 n.20. The Commonwealth did not raise this issue in its Rule 1925(b) statement and, for the first time on appeal, mounts such a challenge, asserting that questions of timeliness and jurisdiction cannot be waived.

hearings without seeking to withdraw. Hence, Mr. Blacknall was effectively without counsel. It is unacceptable for an attorney to argue against his client as to all of his claims without filing a **Turner/Finley** no-merit letter. **See Commonwealth v. Hampton**, 718 A.2d 1250 (Pa.Super. 1998); **Commonwealth v. Karanicolas**, 836 A.2d 940, 947 (Pa.Super. 2003); **compare also Commonwealth v. Willis**, 29 A.3d 393 (Pa.Super. 2011).

Further, the Pennsylvania Supreme Court has ruled that where a PCRA court dismisses a petition prior to appointed counsel filing an amended petition, a subsequent petition may relate back to the original filing. **Commonwealth v. Tedford**, 781 A.2d 1167 (Pa. 2001). In **Tedford**, the petitioner filed his first *pro se* petition before the legislature's passage of the one year time-bar. The PCRA court appointed counsel. However, before counsel filed an amended petition, the court dismissed the petition and directed the petitioner to file a new petition. After Tedford complied, the PCRA court *sua sponte* considered his later filing to be an untimely petition. The **Tedford** Court rejected the view that the petition was untimely.

Similarly, in **Commonwealth v. Duffey**, 713 A.2d 63 (Pa. 1998), the Pennsylvania Supreme Court concluded it was error to dismiss a PCRA petition where an attorney from the Pennsylvania Capital Case Resource Center aided the petitioner in submitting *pro se* documents to the court, but the PCRA court never appointed counsel. The **Duffey** Court concluded, "The trial court erred when it declined to appoint counsel to assist Duffey with the

first PCRA Petition, and the court should have permitted Duffey to litigate the Amended PCRA Petition with the assistance of counsel." ***Duffey***, ***supra*** at 70. While Attorney McMahon did file an initial petition herein, he did not ever represent his client's interests by arguing in favor of that petition. Ostensibly, Mr. Blacknall was constructively without counsel when the PCRA court dismissed the McMahon petition. Thus, we find no error in the PCRA court permitting Mr. Blacknall to litigate his underlying claims and treating his subsequently amended petitions as relating back to his timely petition filed, but not litigated, by Mr. McMahon. ***Cf. Commonwealth v. Williams***, 828 A.2d 981, 990 (Pa. 2003) ("***Tedford*** and ***Duffey*** stand for the proposition that if a court dismisses a *pro se* petition prior to the appointment of counsel, a subsequent counseled petition may not be treated as an untimely second petition.").

Having disposed of the Commonwealth's jurisdictional argument, we now consider its merits-based contention. We review this aspect of the PCRA court's decision in a light most favorable to Mr. Blacknall, as the prevailing party at the PCRA level. ***Commonwealth v. Sam***, 952 A.2d 565, 573 (2008); ***Commonwealth v. Stewart***, 84 A.3d 701, 706 (Pa.Super. 2013). "This review is limited to the findings of the PCRA court and the evidence of record. We will not disturb a PCRA court's ruling if it is supported by evidence of record and is free of legal error." ***Stewart***, ***supra*** (citation omitted). In this regard, "we afford great deference to the factual findings

of the PCRA court and will not disturb those findings unless they have no support in the record." *Id.* Further, we are bound by the credibility determinations of the PCRA court when they are supported by the record. ***Commonwealth v. Johnson***, 966 A.2d 523, 532, 539 (Pa. 2009). Of course, on questions of law, our review is *de novo*. ***Commonwealth v. Hutchinson*** 25 A.3d 277, 284 (Pa. 2011).

The Commonwealth's claim implicates the law governing after-discovered evidence. The law on after-discovered evidence dates back in Pennsylvania to at least 1819. In ***Moore v. Philadelphia Bank***, 5 Serg. & Rawle 41 (Pa. 1819), the Pennsylvania Supreme Court set forth that, to be entitled to a new trial based on after-discovered evidence: "1st, that the evidence has come to his knowledge since the trial; 2d, that it was not owing to want of due diligence, that it did not come sooner; and 3d, that it would probably produce a different verdict, if a new trial were granted." Later, and after citing to ***Moore***, the Pennsylvania Supreme Court expounded on the law regarding a motion for a new trial based on after-discovered evidence in a criminal case in ***Commonwealth v. Flanagan***, 7 Watts & Serg. 415 (Pa. 1844). The ***Flanagan*** Court opined,

> a great deal of testimony has been given, which does not establish independent facts, material to the issue; but its only effect is to impeach the credit of some of the witnesses examined on the former trial. But the rule of law is, that the testimony must go to the merits of the case, and must not be merely for the purpose of impeaching the testimony of the

witnesses. For newly discovered evidence, discrediting witnesses who testified on a former trial, a new trial is never granted.

*Id*. at 423. The case relied upon by the **Flanagan** Court for this proposition was **People ex rel. Oelricks v. Superior Court of City of New York**, 10 Wend. 285 (1833). That decision delineated:

> With respect to granting *new trials on the ground of newly discovered testimony,* there are certain principles which must be considered settled. 1. The testimony must have been discovered since the former trial. 2. It must appear that the new testimony could not have been obtained with reasonable diligence on the former trial. 3. It must be material to the issue. 4. It must go to the merits of the case, and not to impeach the character of a former witness. 5. It must not be cumulative. 4 *Johns. R.* 425. 5 *id.* 248. It cannot be denied in this case that the testimony offered was material to sustain the point of defence; and that it is not liable to the objection that it goes to impeach the plaintiff's witness. Russell says nothing about the character of the witness Heckscher, but contradicts the fact sworn to by him.

*Id*. at 292 (italics in original).[19]

---

[19] The earlier New York case cited in **People ex rel. Oelricks v. Superior Court of City of New York**, 10 Wend. 285 (1833) reasoned, "A new trial is not to be granted, merely on the discovery of new evidence, which would impeach the character of a witness at the trial. There would be no end of new trials on that ground." **Shumway v. Fowler**, 4 Johns. 425 (N.Y.Sup. 1809). Thus, the impeachment evidence referred to by the early courts was in reference to impeaching the character of a witness or impeachment as to non-material facts. Where the evidence contradicted factual testimony as to a material issue, it was not considered as being used solely for impeachment purposes. **See Oelricks**, **supra**; **Cf**. **Commonwealth v. Mosteller**, 284 A.2d 786 (Pa. 1971) (after-discovered evidence in the nature of recantation from a victim, while impeaching the victim's earlier testimony, also was material factual testimony that contradicted facts sworn by that person and was exculpatory in nature); **Commonwealth v. Krick**, 67 A.2d 746 (Pa.Super. 1949) (same).

More recently, this Court has explained in the PCRA context that a "petitioner must plead and prove by a preponderance of the evidence 'the unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced.' 42 Pa.C.S. § 9543(a)(2)(vi)." **Commonwealth v. Foreman**, 55 A.3d 532, 537 (Pa.Super. 2012). In addition, this Court has applied the after-discovered evidence test discussed in **Moore** and **Flanagan** in the PCRA setting.

For example, in **Commonwealth v. Padillas**, 997 A.2d 356 (Pa.Super. 2010), this Court opined that a petitioner must show the evidence "(1) could not have been obtained prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely to impeach the credibility of a witness; and (4) would likely result in a different verdict if a new trial were granted." **Id**. at 363; **see also Commonwealth v. Walker**, 36 A.3d 1, 14 n.17 (Pa. 2011) (PCRA appeal citing direct appeal case law for after-discovered evidence test); **Commonwealth v. Washington**, 927 A.2d 586, 595-596 (Pa. 2007). Failure to satisfy any of these aspects of the test results in the claim failing. **Padillas**, **supra** at 363.

With respect to determining the diligence aspect of the test, a petitioner cannot show diligence if he declined "to question or investigate an obvious, available source of information[.]" **Id**. In addition to

demonstrating that the evidence could not be ascertained despite reasonable diligence, a petitioner must prove that the evidence is not merely cumulative or corroborative of other evidence introduced at trial. Evidence that supports a defense leveled at trial may be considered corroborative and/or cumulative. *Id*. at 365.

We have previously outlined the historical antecedents of the impeachment prong of the after-discovered evidence paradigm. In considering the prejudice prong of the after-discovered evidence test, courts are to look to "the integrity of the alleged after-discovered evidence, the motive of those offering the evidence, and the overall strength of the evidence supporting the conviction." *Padillas*, *supra* at 365. Moreover, the after-discovered evidence must be admissible. *Commonwealth v. Castro*, 93 A.3d 818 (Pa. 2014).

Instantly, the PCRA court granted Mr. Blacknall relief based on two separate after-discovered evidence claims. We address each separately. First, the PCRA court held that Mr. Blacknall was entitled to a new trial based on the PCRA testimony of Regina McKnight, the babysitter of Mr. Blacknall's daughter at the time of the killings. Ms. McKnight testified, credibly according to the PCRA court, that Mr. Blacknall was with her at the time of the shooting.

The Commonwealth begins by arguing that Mr. Blacknall waived the position that Ms. McKnight's testimony constituted after-discovered

evidence. In this respect, it maintains that Mr. Blacknall did not include an after-discovered evidence claim in his PCRA petitions, but only asserted that trial counsel was ineffective in failing to present Ms. McKnight. Instantly, at the PCRA court evidentiary hearings, Mr. Blacknall argued in the alternative that, if the PCRA court rejected his trial counsel ineffectiveness claims, Ms. McKnight's testimony met the after-discovered evidence provision of the PCRA statute. Mr. Blacknall did so in direct response to the Commonwealth's position. Additionally, the Commonwealth acknowledged, in its own post-hearing brief, that Mr. Blacknall was pursuing relief on an after-discovered evidence claim relative to Ms. McKnight, and addressed the argument.

According to the Commonwealth, because the only written argument on Mr. Blacknall's after-discovered evidence claim came in a post-evidentiary hearing brief that was not filed, the PCRA court erred in affording relief on this basis. In support, it relies on ***Commonwealth v. Elliott***, 80 A.3d 415 (Pa. 2013). Therein, the PCRA court granted a new trial on the basis that trial counsel was ineffective for failing to personally meet with his client. The Commonwealth argued that this claim was waived because it was not included in his original 1998 petition or an amended petition, and was only made for the first time in a supplemental 2010 brief. The Pennsylvania Supreme Court agreed. The ***Elliott*** decision is consistent with prior precedent. In ***Commonwealth v. Wilson***, 861 A.2d 919, 928 (Pa. 2004),

the High Court opined, "Neither Appellant's discovery motion nor his 'Post–PCRA Hearing Memorandum' is a substitute for a sufficient PCRA petition and, likewise, neither can be construed as an amendment to such a petition." The **Wilson** Court continued, "While [Wilson's] presentation of evidence before the PCRA court on issues not included in his petition, coupled with the PCRA court's inconsistent treatment of such issues, are troubling, these circumstances do not serve as a substitute for complying with the pleading requirements contained in the PCRA and the Rules of Criminal Procedure." **Id**. n.8.

The Commonwealth, however, did not argue in its post-hearing brief that the position was waived, nor did it assert that the claim was waived on this basis when the issue arose at one of the many PCRA hearings. **See** N.T., 7/13/12, 37-40. More importantly, the Commonwealth did not raise a claim that the PCRA court erred in reaching the merits of a non-pled position in its Rule 1925(b) statement. Accordingly, we find that the Commonwealth's argument relative to inadequate pleadings is waived. **Commonwealth v. Butler**, 812 A.2d 631 (Pa. 2002) (failure to include issue in Rule 1925(b) statement results in waiver). Moreover, Mr. Blacknall's February 5, 2009 amended petition did contain a generic assertion that he was entitled to relief based on after-discovered evidence, though it did not specifically reference Ms. McKnight in relation to that argument. There is no dispute that the Commonwealth and PCRA court

were adequately alerted of the substance of Mr. Blacknall's after-discovered evidence position with respect to Ms. McKnight. *See also* N.T., 4/30/10, at 146 ("We're alleging that trial counsel was ineffective and, in the alternative, perhaps, that if certain evidence is believed here that [Ms. McKnight] was after-discovered.").

As to the merits, the Commonwealth proffers that Ms. McKnight's testimony was cumulative and corroborative of other evidence and would not have changed the outcome of Mr. Blacknall's trial. The Commonwealth points out that Deborah Hale testified that Mr. Blacknall was not on the street at the time of the shooting, having left with Charles Gore. It adds that Mr. Gore testified that he had driven Mr. Blacknall to pick up his daughter at the babysitter's residence. In the Commonwealth's view, Ms. McKnight's testimony only corroborates the same theory Mr. Blacknall presented at trial. The Commonwealth maintains that Ms. McKnight's testimony was "merely another source for the same story the jury had already rejected—that defendant was picking up his daughter when the crime occurred." Commonwealth's brief at 42.

Next, the Commonwealth contends that the PCRA court erred in finding that Ms. McKnight's testimony would have changed the outcome of Mr. Blacknall's trial. It avers that the PCRA court "failed to properly account for the substantial evidence of [Mr. Blacknall's] guilt[.]" *Id*. at 45. Further, the Commonwealth submits that the PCRA court disregarded "crucial

inconsistencies between McKnight's decades-old recollections and other defense evidence." *Id*. Finally, the Commonwealth maintains that the PCRA court erred to the extent it considered Mr. Blacknall's "emotional pleas of innocence[.]" *Id*. It argues that the PCRA court should not have considered Mr. Blacknall's continuous assertions of innocence as a legitimate factor in determining whether he was entitled to a new trial.

From the Commonwealth's perspective, the dying declarations evidence was strong evidence of Mr. Blacknall's guilt as was the fact that he fled the Philadelphia area after the shooting and provided police a false name when he was apprehended. The Commonwealth posits that the jury heard three witnesses present the same defense theory and that one additional witness would not have altered the outcome of the trial. It adds that Ms. McKnight's ability to recall the events numerous years after the fact is "inherently suspect." *Id*. at 48.

The Commonwealth labels Ms. McKnight's recollection as "bizarre" and notes that part of her testimony was contradicted by other defense witnesses. *Id*. For example, Ms. McKnight stated that Ms. Feaster dropped off Mr. Blacknall's daughter between 7:00 and 7:30 a.m. whereas Ms. Feaster maintained that ordinarily the child was transported to Ms. McKnight's between 1:00 and 1:30 p.m. Also, Ms. McKnight maintained that Mr. Blacknall continued to pick up his daughter until January of 1999, and Mr. Blacknall admitted that, after the shooting, he no longer was in the area.

The PCRA court found that the evidence in question was Ms. McKnight's proffered testimony and not her mere existence. It noted the seeming disconnect between the Pennsylvania Supreme Court decision in *Commonwealth v. Hayward*, 263 A.2d 330 (Pa. 1970), and *Commonwealth v. Bulted*, 279 A.2d 158 (Pa. 1971), as well as subsequent case law discussing after-discovered evidence. Ultimately, the PCRA court determined that Ms. McKnight's testimony was not available at the time of trial and that trial counsel and Mr. Blacknall exercised reasonable diligence in attempting to procure her testimony.

In *Hayward*, the defendant leveled an alibi defense at trial. Hayward's mother and girlfriend testified as to an alibi and his mother identified three other individuals who could confirm the alibi. Following trial, counsel presented affidavits from these three witnesses. The Supreme Court summarily disposed of the claim by stating, "We agree with the post-trial motion court that this is not after-discovered evidence, since the identity of these witnesses was known at trial if not before." *Hayward*, *supra* at 331. Hence, taking the *Hayward* Court's disposition to its logical conclusion, no alibi witness could ever serve as after-discovered evidence because the defendant would be aware of that person.

Subsequently, in *Bulted*, the Supreme Court addressed after-discovered evidence in a different fashion. In *Bulted*, the defendant was convicted of killing his wife. At trial, he alleged that he discovered his wife

with another man, identified as Francisco Matos. According to the defendant, he fought with Matos and then returned to his house with his wife, who pulled a gun on him, and was accidentally killed when a struggle over the weapon followed. Matos, though known, did not testify at the trial. Matos later provided a statement to police that corroborated Bulted's account of the earlier fight. The **Bulted** Court determined that Matos' statement was after-discovered evidence. The PCRA court herein astutely noted that under **Hayward's** reasoning, Matos' statement would not have been after-discovered evidence since Matos' identity was known.

It is apparent from **Bulted** that **Hayward** did not hold that an alibi witnesses testimony can never serve as after-discovered evidence. Rather, **Hayward** can be read as commenting on the diligence aspect of the after-discovered evidence test; that is, the alibi witnesses could have testified at trial had the defendant exercised reasonable diligence. Indeed, in **Commonwealth v. Cooney**, 282 A.2d 29 (Pa. 1971), the defendant was awarded a new trial based on physical evidence that he technically could have known was available at the time of trial. There, the defendant was convicted of first-degree murder. He maintained that the victim shot him first, and that he blacked out. According to the defendant, the victim was shot either in a struggle over the weapon or shot herself in suicidal remorse. An X-ray of the defendant taken after trial confirmed that the defendant had

a bullet in his skull. The X-ray was considered sufficient after-discovered evidence to award a new trial.

In *Commonwealth v. Bonaduce*, 313 A.2d 355 (Pa.Super. 1973), the Superior Court rejected an alibi after-discovered evidence claim. However, it did not do so on the basis that alibi evidence can never constitute after-discovered evidence. The *Bonaduce* Court earlier had remanded the case in order to receive an affidavit explaining the alibi and the reason it was not produced at trial. Certainly, if the mere fact of knowledge of an alibi witness precluded the alibi witness's testimony from being after-discovered evidence, no such procedure would have been necessary. The court rejected the after-discovered evidence on the basis that the witness set forth that he was available at trial and no explanation was given for the defendant's failure to call that witness.

In *Commonwealth v. Bonaccurso*, 625 A.2d 1197, 1201 (Pa.Super. 1993), a three judge panel, with one judge concurring and another concurring in result, addressed after-discovered evidence. There, the defendant's trial defense was actually different from his proffered after-discovered evidence defense. At trial, the defendant alleged a misidentification defense. However, a witness who observed the crime, a shooting, and originally had left the scene and lied to police about witnessing the crime, eventually came forward. That individual's testimony regarding the shooting incident could have supported a third-degree murder conviction

instead of a first-degree murder finding. Writing in her concurring decision, the learned Judge Phyllis Beck agreed with the lead opinion that the "new witness' testimony . . . was unavailable at the time of trial[.]" *Id*. at 1202. Thus, where the witness' testimony is unavailable, it may be after-discovered even if the identity of the person is known at the time of trial. To illustrate, if a person's alibi witness was a member of the United States military special forces and was unavailable at the time of trial because he was overseas on a clandestine mission, that person, we do not believe, would be precluded from providing after-discovered evidence simply because his identity was known.

For similar reasons, we do not read this Court's brief statement in *Commonwealth v. Kellam*, 719 A.2d 792 (Pa.Super. 1998), as absolutely precluding an alibi witness's testimony from being considered after-discovered evidence. The *Kellam* panel opined that the "proposed testimony is not truly after-discovered evidence in that [Kellam] obviously knew about the Reynolds prior to trial." *Id*. at 799. While at first blush this could be read as an absolute prohibition against an alibi witness's testimony being considered after-discovered evidence, the remaining context of the decision suggests otherwise.

Rejecting Kellam's position that he could not locate the alibi witnesses, this Court agreed with the trial court's finding that this position was not credible and noted that Kellam's new alibi was inconsistent with the alibi

posed in his notice of alibi at trial. Thus, the **Kellam** Court was actually focusing on the reasonable diligence used to secure the alibi witness. Pointedly, almost a century ago, the court of common pleas in Pennsylvania readily acknowledged that an alibi witness could constitute after-discovered evidence. **Commonwealth v. Hetrick**, 1920 WL 2159; 49 Pa.C.C. 352, 23 Dauph. 262 (Pa.Quar.Sess. 1920); **see also State v. Stowe**, 28 P. 337 (Wash. 1891); **Tyler v. State**, 13 Tex. App 205 (1882).

In the present case, the PCRA court found that Ms. McKnight was not available to testify since she consistently moved and was not located by trial counsel, his investigator, Mr. Blacknall, or his girlfriend, despite repeated efforts. We agree that the evidence in question is Ms. McKnight's testimony and not her existence. **See Flanagan**, **supra** at 423 ("the rule of law is, that the testimony must go to the merits of the case"); **Oelricks**, **supra** at 292 ("The testimony must have been discovered since the former trial. 2. It must appear that the new testimony could not have been obtained with reasonable diligence on the former trial."); **Bulted**, **supra**. Ms. McKnight's testimony was revealed after Mr. Blacknall's trial. Based on the PCRA court's findings regarding availability and diligence, which the Commonwealth does not dispute, we find that the record does support a finding that Ms. McKnight was not available at the time of trial since repeated and consistent efforts to locate her and have her come forward failed.

We also reject the Commonwealth's argument that Ms. McKnight's alibi testimony fails the after-discovered evidence test as cumulative and corroborative. First, we highlight that in **Commonwealth v. Dennis**, 950 A.2d 945 (Pa. 2008), our High Court asserted that, "Where the defense is one of mistaken identity, and the only alibi witness Appellant presents is his father, it seems plain that the addition of an unrelated alibi witness whose testimony corroborates other testimony tending to exculpate Appellant is not 'merely cumulative[.]'" **Id**. at 963. The **Dennis** Court's decision is consistent with long standing precedent from other jurisdictions as well as the common pleas court decision in **Hetrick**, **supra**.[20]

In **Hetrick**, the defendant was found guilty of statutory rape. The court awarded a new trial based on the testimony of a John C. Ensminger. Addressing the cumulative aspect of the alibi testimony, the court recognized that Ensminger's evidence "is to some extent cumulative, because other persons testified to the whereabouts of Hetrick on the night in question." **Hetrick**, **supra** at *2. Nevertheless, relying on several other common pleas decision and sister state decisions, it opined, "The rule of excluding cumulative testimony should not be strictly applied where such after-discovered testimony, though to some extent cumulative, is intended to establish an *alibi*[.]" **Id**.

---

[20] We are aware that common pleas court decision are non-binding. **Hetrick**, however, is consistent with **Commonwealth v. Dennis**, 950 A.2d 945 (Pa. 2008), and well established authority from other jurisdictions.

In **Stowe**, **supra**, referenced by the **Hetrick** Court, the Washington Supreme Court, relying on Texas precedent, reasoned,

> Inasmuch as other testimony had been introduced to prove this *alibi,* it is urged that the newly-discovered testimony is cumulative, and therefore not sufficient to command a new trial; but this rule governing cumulative evidence must be received with some modification, and given a common-sense construction, and, whatever may be its application to other character of testimony, we do not think it applies where the object of the evidence is to prove an *alibi.* In **Pinckord v. State**, 13 Tex. App. 468, the court says: "That evidence is cumulative, where the object sought is to prove an *alibi,* is no reason for its exclusion; on the contrary, the greater the number of witnesses to the facts establishing it, the stronger, ordinarily, would be our reliance upon and conviction of its truth."

**Stowe**, **supra** at 338-339.

Moreover, Ms. McKnight's testimony is not merely cumulative and corroborative. While Ms. Hale and Mr. Gore testified to Mr. Blacknall not being at the scene, Ms. Hale did not relate where Mr. Blacknall was during the shooting. Similarly, Mr. Gore only indicated that he dropped off Mr. Blacknall at a residence away from the shooting. Ms. McKnight, however, testified that Mr. Blacknall was with her for a period encompassing the time frame when the shootings occurred. Thus, her testimony, though corroborating Ms. Hale and Mr. Gore's recollections, offered first-hand additional facts supporting Mr. Blacknall's alibi and is not "merely corroborative."

Accordingly, while Ms. McKnight's alibi testimony "may, indeed, incidentally or indirectly cumulate, corroborate and impeach. . . . its main

office and direct effect are to deny the identity of the assailant with the defendant, and, therefore, the truth of the charge made against" him and is proof of his "absence from the place where [he] is said to have been[.]" ***Commonwealth v. Mitchell***, 1918 WL 2940, 1; 11 Berks Co. L.J. 49 (Pa.Quar.Sess. 1918). Further, Ms. McKnight, unlike the other witnesses, was not friends with Mr. Blacknall. Thus, pursuant to ***Dennis*** and long-standing decisional law that we find persuasive, Ms. McKnight's testimony does not fail the after-discovered evidence test as merely cumulative or corroborative.

As to the impeachment aspect of the after-discovered evidence paradigm, the Commonwealth has never maintained that this portion of the test is not met. It is evident that the alibi testimony is not merely being used to impeach the character of any witness nor is it solely being used as impeachment evidence. Therefore, we proceed to consider the PCRA court's ruling on prejudice.

The PCRA court related that the Commonwealth's "entire case depended on Rashaun Calhoun's identification of [Mr. Blacknall]; even though Calhoun interacted with a person that he thought was petitioner in the minutes leading up to the shooting, the gunshots were fired from a 'distant range' and struck Calhoun as he was attempting to flee." PCRA Court Opinion, 6/28/13, at 32. Outside the dying declarations, the only

other evidence to support Mr. Blacknall's conviction was the circumstantial evidence that he left the area and when he was arrested gave a false name.

Thus, we disagree with the Commonwealth's assertion that "the evidence of defendant's guilt was extremely strong[.]" Commonwealth's brief at 43. We acknowledge that the jury heard testimony from Mr. Blacknall, Mr. Gore, and Ms. Hale that he could not have been the shooter. Of course, the jury was left with the question of why Mr. Blacknall's alibi witness did not testify on his behalf. As discussed, where a defendant's defense is an alibi, the more evidence that supports that defense increases its likelihood of success. The PCRA court deemed Ms. McKnight credible, and her testimony that is material to Mr. Blacknall, *i.e.*, that he arrived at her home around 6:15 every weekday to pick up his child and was with her at the time of the shooting, was consistent with Mr. Blacknall's defense, as well as Mr. Gore and Ms. Hale's trial testimony.

While the Commonwealth is undoubtedly correct that it may attack Ms. McKnight's credibility as to her recollection at a new trial, for purposes of PCRA review, a PCRA court is not required to determine whether the jury would find the witness credible. **See Johnson**, **supra** at 541 (discussing prejudice for purposes of ineffectiveness test and stating, "we reject the Commonwealth's suggestion that the PCRA court 'must necessarily find that if the evidence presented at the PCRA hearing had been presented at trial, it would have been found to be credible by the jury and would have resulted in

appellee's acquittal.'"). The Commonwealth's position that Ms. McKnight's testimony must "result in a different verdict[,]" Commonwealth's brief at 53, is an inaccurate representation of the law. Rather, the question is whether it would *likely* compel a different verdict. We find ample support for the PCRA court's legal conclusion in this regard.

Mr. Blacknall has testified at multiple proceedings that he is innocent and has continuously maintained the same alibi defense. At trial, Mr. Blacknall submitted that he was with his daughter's babysitter, Gina. Mr. Gore stated that he took Mr. Blacknall to the babysitter's. Ms. McKnight has consistently maintained, throughout PCRA proceedings dating back to 2004, that Mr. Blacknall was with her during the period in which the crime occurred, including a statement given to police in 2009. Ms. Hale testified that Mr. Blacknall was not at the scene and that Clinton Driver was the shooter. Mr. Blacknall has indicated from the beginning that Clinton Driver was the perpetrator. Clinton Driver is currently incarcerated for killing a person who was an alleged witness in this case, though he and the Commonwealth maintain that the killing was unrelated to this matter. Clinton Driver's brother Steven also shot Mr. Gore.

Considering the evidence in a light most favorable to Mr. Blacknall, we find that there is evidentiary support for the PCRA court's factual findings. Furthermore, we hold that the PCRA court's legal conclusions based on those

findings are free of legal error. Therefore, we affirm the PCRA court's award of a new trial based on Ms. McKnight's testimony.

Having found that Mr. Blacknall is entitled to a new trial, we need not address Mr. Blacknall's remaining appellate issues. However, as the PCRA court's findings relative to Mr. Blacknall's after-discovered evidence claim as to Toby Wellington implicates potential trial matters, we briefly discuss that issue. The PCRA court ruled that Mr. Wellington's hearsay testimony regarding Clinton Driver's confession would be admissible at a new trial under **Chambers v. Mississippi**, 410 U.S. 284 (1973). In light of **Commonwealth v. Spotz**, 18 A.3d 244, 274-275 (Pa. 2011), that finding is erroneous to the extent the PCRA court found that such testimony would be admissible as substantive evidence.

In the present case, Clinton Driver's statement to Mr. Wellington did not come within the statement against penal interest exception to the hearsay rule because Clinton Driver was available to testify at the PCRA hearing. Pa.R.E. 804(b)(3); **Spotz**, **supra** at 273-274. Mr. Wellington's testimony, therefore, was only admissible at the PCRA hearing, and any trial at which Clinton Driver would be available to testify, for impeachment purposes. **See** Pa.R.E. 803.1(1); **Commonwealth v. Brady**, 507 A.2d 66 (Pa. 1986); Pa.R.E. 613. Although **Chambers** indicates that constitutional due process may trump state evidentiary rules, the facts of **Chambers** are dissimilar to the interaction between Mr. Wellington and Clinton Driver. Nor

is this case analogous to **Chambers** progeny, **Holmes v. South Carolina**, 547 U.S. 319 (2006). Thus, while Mr. Blacknall would be permitted to call Clinton Driver at his subsequent trial and potentially impeach his denial of committing the crime with Mr. Wellington's testimony, that testimony would not be substantive evidence.

Order affirmed.

Judgment Entered.



Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/27/2015